UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GOLDEN, *et al.*,

             Plaintiffs,

v.

KELSEY HAYES CO., *et al.*,

             Defendants.

_____/

Case No. 2:93-cv-40530
District Judge Arthur J. Tarnow
Magistrate Judge Anthony P. Patti

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO GRANT PLAINTIFFS' MOTION FOR CONTEMPT (DE 573)

### I.    RECOMMENDATION:

The Court should **GRANT** Plaintiffs' Motion for Contempt against Defendants (herein referred to as TRW), and order further discovery as to the extent of non-compliance with prior injunctions to inform the Court as to the appropriate sanction and deterrence. (DE 573.)

### II.    REPORT

#### A.    Background

As explained in the Court's November 8, 2016 order granting Plaintiffs' motion to enforce settlement and denying their motion for contempt: "The cases at issue arose from three separate class actions between [TRW] and some of its retirees, former employees and/or their surviving spouses. Ultimately, settlement

1

agreements were reached which guaranteed, *inter alia*, that health care benefits would be fully paid by [TRW], and provided to Plaintiffs for life. [TRW] agreed to provide prescription drug benefits to the designated recipients in accordance with the parties' settlement agreements." (DE 531 at 2.)[1] The parties now return to the Court based upon Plaintiffs' belief that, despite this Court's previous clarifications (DEs 369, 531), TRW continues to willfully violate this Court's previous injunctions against the use of preauthorization prescription drug protocols. (DE 573; *see* DEs 479, 531.) The Court held a hearing on Plaintiffs' motion for contempt on July 11, 2019, and took the motion under advisement. (DE 586 at 80.)

## B.   Certified Facts

Except where a United States Magistrate Judge exercises consent jurisdiction in a civil case under 28 U.S.C. § 636(c), or misdemeanor jurisdiction under 18 U.S.C. § 3401, the Magistrate Judge may not enter an order of civil contempt. Judge Tarnow has referred Plaintiffs' motion for contempt to me for a report and recommendation. (DE 583.) As contemplated by 28 U.S.C. § 636(e)(6)(B), the Undersigned certifies the following facts:

   **1.**   This Court retains continuing jurisdiction over all parties in this case
            "for the purposes of enforcing and administering the Settlement

---

[1] Unless otherwise indicated, all record citations are to the instant record (*Golden*) in Case No. 93-40530. References to the *Fox* and *Colby* records pertain to Case Nos. 93-74615 and 94-71698, respectively.

Agreement." (*Golden* DE 414; *Fox* DE 279; and *Colby* DE 201; *see also* DE 586 at 79-80.)

2. Plaintiffs, the *Golden*, *Fox* and *Colby* Retiree Committees, have moved for an order holding TRW in contempt of the March 31, 2011 and November 8, 2016 injunctions (the "2011 Injunction" and "2016 Injunction," respectively) issued by this Court, which bar TRW from implementing and maintaining prescription drug exclusion policies.  (DE 573 at 2-3.)

3. The *Golden*, *Fox*, and *Colby* settlement agreements entitle retirees and surviving spouses to lifetime health care benefits, including prescription drug benefits, continuing at the same standard agreed upon since its implementation on December 31, 1993.  (DE 531, 573.)

4. The Court has previously found that TRW violated these settlement agreements four times in *Fox* and three times in *Golden* and *Colby*, enjoining them from activities in furtherance thereof.  (*Fox* DE 323, 349, 369, 420; *Golden* DE 458, 479, 531; *Colby* DE 265, 286, 336.)

5. The Court's 2011 Injunction enjoins TRW from "materially reduc[ing]" the extent of plan coverage based on "medical necess[ity]," which the Court deems a "prior approval process":

> The mere fact that each settlement agreement plan only covers drugs that are medically necessary does not mean that Medco's new protocols – even though grounded in its right to a medical necessity review – cannot result in a material reduction of the level of promised plan benefits.
>
> In that regard, the Court deems the Defendant's imposition of a "prior approval" process for certain drugs that were previously available without such a coverage review to be a "new condition or requirement" that materially reduces the level of plan benefits.  (DE 479 at 13-14.)

6. The 2011 Injunction then singles out other "new drug protocols" that TRW cannot implement "to the extent that they materially affect" coverage under the settlement agreements:

[T]he Court deems the Defendant's imposition of a "prior approval" process for certain drugs that were previously available without such a coverage review to be a "new condition or requirement" that materially reduces the level of plan benefits. The Court has a similar view of Medco's other new drug protocols, which are not described in detail by the Defendant but whose very names (e.g., "preferred drug step therapy," "quantity/duration reviews," and "prior authorization reviews") suggest an exploratory, pre-screening process requirement that each participant must undertake before the Defendant will pay for the drug. (DE 479 at 14.)

7. Medco had been TRW's prescription benefit manager (PBM) when the 2011 Injunction was imposed. A 2012 merger of Medco and ExpressScripts, Inc. (ESI) led to ESI becoming and remaining TRW's PBM to date. (DE 479 at 7; DE 586 at 10.)

8. On January 1, 2014, TRW chose to implement a drug exclusion policy ESI proposed known as the 2014 National Preferred Formulary (NPF) which, as of 2016, grew to encompass a list of fifty-three drugs. (DE 531 at 6-7.)

9. On March 28, 2014, TRW filed a motion for an "Order Clarifying and Declaring TRW's Rights and Responsibilities Relative to the Delivery of Prescription Drug Benefits Mandated by the Settlement Agreements." (DE 480.)

10. Six days later, on April 3, 2014, Plaintiffs filed a motion for contempt based on TRW adopting ESI's NPF despite the 2011 Injunction. (DE 481.)

11. In the associated court proceedings, TRW admitted that the 2011 Injunction enjoined TRW "from implementing the prior authorization coverage review, 'preferred drug step therapy,' 'quantity/duration reviews,' and 'prior authorization reviews' that were at issue at that time." (DE 531 at 7-8; *see also* DE 516 at 5.) TRW's motion for a clarifying order was subsequently denied by the Court on November 8, 2016. (DE 531.) The Court also denied

the motion for contempt, expressing its concern that its previous order was not definite and specific in its exclusion of the 2014 change instituted by TRW. (*Id.* at 14.) The Court did, however, indicate that TRW "may have violated an ambiguous order." (*Id* at 15.)

**12.** The Court's second injunction, the 2016 Injunction dated November 8, 2016, reiterates that TRW is enjoined from implementing ESI's policies that "unilaterally institute preapproval procedures for previously covered prescriptions," and further specifies that TRW is enjoined from "exclud[ing] previously covered prescription drugs, subject to a pre-authorization procedure." (DE 531.)

**13.** On July 19, 2018, the parties came before the Court for a hearing, placing on the record a stipulation as to a Motion to Compel discovery requested by Plaintiffs. ESI agreed to produce written communications from TRW in regard to plan and benefit changes for prescription drug coverage pertaining to class members. (DE 568.)

**14.** A "2015 PBM Agreement Service Addendum" was produced in discovery. This Addendum, effective January 1, 2015, between TRW and ESI "directs [ESI] to implement the selected programs attached on the Clinical Programs schedule" as of its effective date. (DE 573-4 at 2, ESI 59.) The Clinical Programs schedule explicitly indicates that ESI will "Add" "Prior Authorization" to 249 drugs and "duration/quantity management" restrictions on 21 drugs and 35 medical conditions. (DE 573-4 at 5-9, ESI 62-66.) The 2015 Addendum applies to *Golden*, *Fox*, and *Colby* class members because their TRW contract numbers – 177010 and 40280 – obtained from the first column entitled "CONTRACT NUMBER" in the table attached to Plaintiffs' brief as Exhibit E, are listed on the second page of the 2015 Addendum. (DE 573-6 at 2-8, ESI 201-07; DE 573-4 at 4, ESI 61.)

**15.** Also obtained in discovery was the "2016 PBM Agreement Service Addendum." This contains a prior approval list which keeps "In Place" the "Prior Authorization," "Drug Quantity Management," and "Limited Step Therapy" lists, the first two of which were

5

implemented in the 2015 Service Addendum.  (DE 573-5 at 7-8, ESI 231-32.)  Moreover, the 2016 Service Addendum contains a "Prior Authorization" (PA) list titled "Compound Management PA" list, which includes Gabapentin powder (Gabapentin).  (DE 573-5 at 7, ESI 231.)

16. Gabapentin is a prescription drug denied to Mr. N.P., a *Fox* Class Member, on November 15, 2016.  Mr. N.P., had been obtaining this drug through a prescription from 2012 through 2015.  (DE 573 at 16.)  According to Defendant, Mr. N.P.'s Gabapentin prescription was (apparently) flagged and rejected pursuant to an unidentified protocol.  (DE 586 at 39-41; DE 573-5, ESI 231.)  TRW acknowledges that this denial "may have, in fact, violated the 2011 order[,]" but seeks to excuse the violation by noting that it only "occurred seven days after the November 8, 2016 clarifying order." (DE 586 at 53, 49.)[2]  However, the 2016 Injunction "may be" irrelevant to Mr. N. P., since the preapproval had *already* been enjoined in 2011, and TRW admits that, "if he was getting it all along, then he probably shouldn't have been denied it under the status of the settlement agreement."  (*Id*. at 54, 52; see also *id* at 51.)  Ultimately, despite being challenged well in advance on this very point, defense counsel was unable to say at the hearing whether Mr. N.P.'s prescription was denied because of a prior authorization or safety issue.  (*Id.* at 42-43.)[3]

---

[2] TRW attributes this to "human error[,]" but when asked at the hearing if the denial was, "if not in violation of the earlier injunction . . .in violation of the November 8, 2016 clarifying order, albeit only by seven days[,]" defense counsel agreed that, "I think that's probably correct, Judge, yes."  (DE 586 at 51.)  Apparently, "this program is one that depends a lot upon human beings getting it right" and "maybe that's the answer to understanding that *something else has to occur*…in writing, as to how these [protocols, appearing in ESI 231] are implemented."  (*Id.* at 35, 48-49 (emphasis added).)

[3] In making my findings with respect to contempt, I find no basis for assigning fault to defense counsel. It is my distinct impression that she has her hands full with this client, having to explain and defend against its unilateral actions or inactions, through no fault of her own.

**17.** It is uncontested that the "Advantage Plus PA List" from the 2016 Service Addendum also includes Xarelto. (DE 573 at 21-22.) Xarelto is a prescription drug that had originally been denied to Ms. C.A., the wife of a *Golden* Class Member, on the basis of a "prior authorization" being needed. (DE 546-5.) TRW characterized this as a "medical necessity" review in its brief, but conceded at oral argument that "[i]t could be based" on a step therapy, which would be a violation of the 2011 Injunction. (DE 581-2 at 2; DE 586 at 56-57.)

**18.** It is undisputed that the issues of prescription drug denial regarding Mr. N.P. and Ms. C.A. were fully resolved by TRW in 2017. (DE 581 at 2.)

**19.** TRW has provided an e-mail dated October 2, 2017 in its response brief, indicating that ESI resolved Ms. C.A.'s denial by contacting her prescribing doctor in order to obtain "medical necessity" assurances, and that once such assurances were received the prescription was approved. (DE 581-2.)

## C.    Problematic characteristics of the service agreement and protocols

The Court is especially troubled by the 2016 Service Addendum, which is indisputably still serving to provide the parameters of the prescription medication program, with an effective date of February 1, 2017. (DE 573-5 at 3-8; DE 586 at 46-47.) It was executed by Shelly Iacobelli, whose title was "Director Pension Benefits" at TRW. (DE 573-5.) The cover sheet of the document reads (in pertinent part, with capitalization standardized): "Carrier 2531 BLP/Contract *** Group intent: retiree litigant (PA and DQM only) with standard PPI step rule *** Client name… TRW Automotive[.]" Translated: PA = pre-authorization, and DQM = duration quantity management. (DE 573-5; DE 586 at 73-74.) As

7

Plaintiffs' counsel explained, without contradiction from Defendant, "This is the plan for *our group*. It's not [just] a group [where one could say], 'Oh, this is all of TRW, *all* the people who have retired under TRW.'  Nobody else has retired under this plan.  This [is the] plan we litigated."  (*Id*. at 74 (emphases added)).

Attached to this plan is a chart of "clinical programs" that shows which aspects of the plan remain "in place" and which have been "removed."  (DE 573-5 at 5-8.)  "Prior authorization" remains "in place" and was not "removed" with respect to the oncology package or compound medications, including Gabapentin. The letters "PA" are sprinkled throughout the chart and are indicated as being "in place."  (*Id*., see ESI 231.)  Thus, as the Court observed at the hearing on the present motion, "you would expect, in order for there to have been compliance with the injunction, that the little 'x' that's in the 'in place' column would have moved over to the 'removed' column."  (DE 586 at 32.)  And as Plaintiffs' counsel explained, these programs should no longer be "in place" for "prior authorization, step therapy, duration, quantity management."  (*Id.* at 32, 64-65.)

Defense counsel, in turn, acknowledged that the Court's 2011 Injunction enjoined TRW and its PBM from implementing prior authorization reviews, referred drug step therapy, and quantity duration reviews, and that all of the items in this litany still exist in the plan.  (*Id*. at 42-43.)  When asked by the Court if it is "true that there are 150 or more drugs made subject to preapproval under the

current plan[,]" defense counsel responded that she had "not counted those[,]" but admitted that there are some. (*Id*. at 64.) However, TRW maintains that these prohibited items are somehow not enforced with respect to *the particular population* which is part of the class, i.e., that notwithstanding the plain language of the documents, the class members are *somehow* excluded from these provisions in the plan. (*Id*. at 65.) This occurs because class members are somehow flagged as being excluded from these prohibited protocols when they submit a claim, although TRW is unable to explain exactly how that happens:

> **THE COURT:** So the protocols -- if I understand this right, the protocols are in place and then when someone submits a request, then some flag goes up and says they're part of the class, and therefore, these protocols don't get implemented as to this individual?

> **MS. HUMPHREY (defense counsel):** I believe that is correct. I think it *probably* happens this way. If it's something that somebody has been receiving all along, there may be no flag at that point. It's just dispensed.

(*Id*. at 65 (emphasis added).) Yet when asked if there is a written agreement or instruction by which the ESI is alerted to refrain from implementing the prohibited protocols against the class members, defense counsel explained that, "I don't know what exists on the ESI side. *** I don't know how they implement that…I just don't know the answer to that." (*Id*. at 66.) Nor can TRW identify a paper trail by which it instructs ESI to "avoid denials that are based on protocols that are not supposed to be applied to class members[,]" although TRW claims to have

provided ESI with copies of the Court's prior orders.  (*Id*. at 66-67.)  The best

TRW can do − despite being challenged on this very issue, and through counsel's

unsupported argument alone − is tell the Court of its "understanding" that "they are

not being implemented" and "not being imposed" "against class members."  (*Id*. at

68.)

    When asked by the Court if all "these 'x's' that go straight down the line and

[remain] 'in place' [in the service agreement] should not all be there if you're in

compliance with the injunction[,]" Defendant could not "answer that 'yes' or 'no.'"

because "[t]here *may* be many things that one of these protocols *can* appropriately

address for a retiree in this population that does *no*t violate the orders of this

Court."  (*Id*. at 47 (emphases added).)  And despite admitting that "prior

authorization" should not still be "in place" because it is "prohibited by the

injunction[,]" and that these two denials "shouldn't have happened" (*Id*. at 48, 50),

TRW seeks to excuse the plain language of the plan by assuring the Court that "it

is not implemented with respect to this population" and that their counsel is "not

aware of any *other* denials," in the past five years beyond the two at issue.  (*Id*. at

47, 50, 58 (emphasis added).)  In other words, TRW violated the injunction which

led to class members being improperly denied, but the violation is *de minimus in*

*effect*.  (See *id*. at 50.)  Or, as defense counsel puts it, it "is an erroneous possible

violation of the 2011 order in two instances, both of which were resolved."  (*Id*. at

70.)  These answers and characterizations are hardly reassuring, particularly where at least two individuals *have* been denied their medications under these prohibited protocols.  As Plaintiffs' attorney points out, the system described by TRW relies upon: (1) ESI *refraining from applying* the "in place" protocols to the class members; and, (2) class members, many of whom are now in their 80s and 90s, knowing or suspecting that their rights have been violated and contacting their attorney to report the transgressions.  (*Id.* at 18, 34-35.)  It engenders what Plaintiffs accurately describe as a "catch me if you can" scheme.

Plaintiffs' counsel succinctly summarized the current lay of the land in explaining that TRW is:

> attempting to rebut a document, a contract between itself and ESI that explicitly states that these protocols are in place by saying, "But we told them not to verbally." We don't have any evidence of that whatsoever. That is not sufficient.
>
> ****
>
> The appropriate evidence to say that they have implemented the injunctions with respect to this group is to have those x's in the "removed" section.
>
> ****
>
> [TRW] says, "I don't know if there's a paper trail," about this issue of instructing ESI to treat this group of people differently than indicated in the contract that they have with them.
>
> And actually, we do know. We know that there isn't a paper trail, that they have not produced a single piece of paper or document. And they can't rely upon ignorance at this point. We have been raising this issue and asking for the documents that show that they are compliant and that they have instructed ESI to comply with the injunctions for years.

11

(*Id*. at 77-78.)

The Undersigned views this as an accurate summary.  TRW has been accused of failing to take reasonable steps to ensure that the Court's orders are followed in the administration of its benefits plan with respect to the class members.  The Court has been shown that prohibited protocols still exist in the plan and that at least two class members have been improperly denied because of these protocols.  Now would be the time for TRW to come to the Court and show a solid plan for assuring compliance with the injunctions.  On this score, Defendant has come up short.

### D.    Law

#### 1.    Standard of Review

A litigant may be held in contempt if it is shown "by clear and convincing evidence that he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."  *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987) (citation omitted). For the plaintiff to prevail, the order that has been violated must be "clear and unambiguous."  *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 550-51 (6th Cir. 2006).  If there is ambiguity, it must be resolved in favor of the charged party.  *Id*.

Our Court has articulated that the burden of proof in a civil contempt proceeding need not be beyond a reasonable doubt; however, the Sixth Circuit has

stressed that this standard is not a light burden.  *GMC v. Ultra Golf Carts, Inc.*, No. 02-CV-73853-DT, 2005 U.S. Dist. LEXIS 8839, at \*9-10 (E.D. Mich. May 13, 2005); *see Consol. Coal Co. v. Local Union No. 1784, United Mine Workers of Am.*, 514 F.2d 763, 766 (6th Cir. 1975).

The requirement that Defendant acted "with knowledge of the court's order" is not applicable to corporate entities.  As such, Plaintiff need only show with clear and convincing evidence that TRW did not comply with the Court's order.  *See Elec. Workers Pension Trust Fund of Local Union #58 v. Gary's Elec. Serv.*, 340 F.3d 373, 379 (6th Cir. 2003) (finding that plaintiff met its initial burden of proof for contempt against a corporation when it did not comply with district court's judgment, but requiring evidence of corporation owner's knowledge of the court order to hold *the owne*r in contempt).

## 2.   Burden Shift

If the movant has established a *prima facie* case for contempt, the burden shifts to the non-movant.  *United States v. Rylander*, 460 U.S. 752, 757 (1983). The non-movant then must show a present inability to comply with the court's order.  *Id*.  The burden requires the defendant to show "categorically and in detail" why it was unable to comply.  *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996).  In making this determination, the test is whether TRW "'took *all reasonable steps within [its] power* to comply with the court's order.'"  *United*

13

*States v. Conces*, 507 F.3d 1028, 1043 (6th Cir. 2007) (emphasis added) (quoting *Glover v. Johnson,* 934 F.2d 703, 708 (6th Cir. 1991) (internal quotation marks and citation omitted).

### 3.    Relief

A district court has the authority to impose sanctions for the failure to comply with a court order.  *Downey v. Clauder*, 30 F.3d 681, 685 (6th Cir. 1994). In civil contempt proceedings, sanctions may be "employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947).  If compensation is sought, it should be granted remedially for the losses sustained by past disobedience which can include costs.  *Gompers v. Bucks Stove & Range Co.*, 211 U.S. 418, 450 (1911).

### 4.    Policy

Contempt proceedings are structured to allow for potentially harsh penalties to further the ends of the law and for the sake of judicial efficiency, so that judgments will be complied with promptly.  *See Cincinnati Bronze*, 829 F.2d at 591. This is consistent with the *Rolex* Court's holding that "the intent of a party to disobey a court order is irrelevant to the validity of a contempt finding."  *Rolex Watch U.S.A.*, 74 F.3d at 720.  The courts have made clear that their rulings must be followed.

14

### E.    Discussion

### 1.    Plaintiff has established a prima facie case for contempt by clear and convincing evidence

The 2015 and 2016 Service Addenda are clear and convincing evidence of a violation of the 2011 Injunction.  The 2011 Injunction unambiguously enjoins TRW from "materially affect[ing]" the extent of plan coverage through prior approval processes.  (DE 479 at 14.)  "Add[ing]" new prescription drugs to "Prior Authorization" and "Drug Quantity Management" lists in the 2015 Service Addendum and, thereafter, in the 2016 Service Addendum, and keeping "In Place" these preapproval protocols as well as a "Step Therapy" protocol, clearly serves the purpose of limiting plan coverage for individuals subject to the preapproval lists. Plaintiff class members are subject to these preapproval lists as their TRW contract numbers, 177010 and 40280, appear on the list, generated by ESI, of those subjected to the 2015 Service Addendum.  (DE 573-4 at 3, ESI 60; DE 573-5 at 4, ESI 228.)  This has been exemplified through the denial of prescription medication for two class members, Mr. N.P. and Ms. C.A.  (DE 573-4 at 3, ESI 60.)  Mr. N.P.'s denial of Gabapentin appears quite clearly to be because of its placement on the 2016 Service Addendum's "Compound Management PA" list. (DE 573, ESI 231.)  Similarly, Ms. C.A.'s denial clearly appears to be due to her medication's placement on the 2016 Service Addendum's "Advantage Plus PA List."  Yet when pressed on this issue at the hearing, defense counsel could only

say: "I don't know whether it was denied initially because of a prior authorization or because it was – it concerned about the safety issue that I described.  I just don't know the answer. I don't have that information."  (DE 586 at 42.)  When pressed yet further, the following colloquy emerged:

> **THE COURT**: But you can't tell me that with respect to the gentleman who was denied the Gabapentin that it was based on safety as opposed to protocol?
>
> **MS. HUMPHREY**: I cannot tell you that, Judge.
>
> **THE COURT**: And what about as to the other lady that's been pointed out?
>
> **MS. HUMPHREY**: I think that was based on a protocol of a name-brand drug as contrasted with a generic.
>
> **THE COURT**: Is it fair to say, though, that by these prohibited protocols still existing, that it's likely that people are going to get denied if, for no other reason, than through human error?
>
> **MS. HUMPHREY**: I -- I can't say that it's likely.   I can certainly say that it's possible. And I can say that it is, in fact, it would be through human error. Yes, Judge.

*****

> **As to N.P.:**
>
> **THE COURT**: Well, I mean, the Court would have expected that in defense of this accusation you'd come forward and tell me exactly what the reason for the denial was. But is it fair to say it does appear to be some sort of a -- as you mentioned before, some sort of a preapproval process?
>
> **MS. HUMPHREY**: Or some sort of a protocol that speaks to compounds or Gabapentin, yes.

*****

16

**As to C.A.:**

**THE COURT**: So Ms. Humphrey, you've heard what Ms. Brault just said. You've indicated it's based upon name-brand versus generic. But could it also be characterized as a step therapy? In other words, "We'll give you the generic and maybe move you up to a name-brand, although I'm not sure pharmaceutically whether that makes any difference."

**MS. HUMPHREY**: It could be based on that, Judge. What I know occurred once we became aware of it, because Ms. Brault brought it to my attention, was that I called TRW, and TRW called ESI, and ESI said, "We will not make denials for that medication for that patient in the future." And I think -- I think it was dispensed.

**THE COURT**: If it was based on a step therapy, that would be a violation of the 2011 injunction?

**MS. HUMPHREY**: It would.

(*Id.* at 43-44, 55.)  Unable to say why these prescriptions were denied, or even to refute Plaintiffs' claim that the denials were caused by prohibited preapproval protocols or step therapies, it does appear that TRW has not taken all reasonable steps to comply with this Court's prior orders, or is unwilling to do so.[4]

Additionally, TRW provided an e-mail in its response brief which indicates that ESI resolved Ms. C.A.'s denial by contacting her prescribing doctor in order to obtain "medical necessity" assurances.  (DE 581, Exhibit 1.)  This argument is also

---

[4] Concerning Ms. C.A.'s denial, defense counsel contends it was not caused by a preapproval process, but that Ms. C.A. was denied brand name drug Xarelto because there is a generic substitute available.  Xarelto's patents have not expired and therefore there is no generic substitute, so this argument is rejected.  *Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations*, U.S. Food & Drug Admin., https://www.accessdata.fda.gov/scripts/cder/ob/search_product.cfm.

unsuccessful, because the 2011 Injunction specifically states that despite "its right to a medical necessity review[,]" ESI's new protocols "cannot result in a material reduction of the level of promised plan benefits." (DE 479 at 14.)  Because Xarelto was added to a 2016 Service Addendum PA list, and because Ms. C.A.'s denial of medication was not resolved until Plaintiffs' counsel contacted TRW, there is clear and convincing evidence of a "prior approval" process for a drug not previously subject to such a coverage review in violation of the settlement agreements.

Lastly, TRW asserts that the 2015 and 2016 Service Addenda pre-date the 2016 order clarifying the 2011 Injunction and, therefore, TRW did not violate a definite and specific order.  However, TRW admits that the 2011 Injunction enjoined it "from implementing the prior authorization coverage review, 'preferred drug step therapy,' 'quantity/duration reviews,' and 'prior authorization reviews' that were at issue at that time."  (DE 531 at 7-8; *see also* DE 516 at 5.)  These are the very preapproval processes set "In Place" in the 2015 and 2016 Service Addenda.

### 2.    TRW has failed to overcome the burden shift

TRW has provided no evidence in its brief of a present inability to comply with the Court's order.  Its primary argument that all issues pertaining to this litigant class, including those involving Mr. N.P. and Ms. C.A., have been resolved after contacting ESI, does not answer the question of why TRW has fashioned and

continued to maintain preapproval processes in violation of the settlement agreements. *See GMC v. Ultra Golf Carts, Inc.*, 2005 U.S. Dist. LEXIS 8839, at *25 (Defendant "miss[ed] the point" of the injunction after resolving its previous violation and thereafter reoffending in a similar way). The test is whether TRW took all reasonable steps to comply with the Court's order. It is acknowledged that by providing Mr. N.P. and Ms. C.A. their prescriptions, TRW did take a reasonable step towards compliance *ex post facto*; however, *all* reasonable steps must be taken to comply with the Court order in the first instance. As discussed at length at the hearing on July 11, 2019, TRW could, and perhaps should, have demonstrated that it took all reasonable steps to comply with the 2011 Injunction, by presenting proof that its most recent service addendum with ESI has marked as "Removed" all of the prescriptions drugs with a preapproval process previously marked as "Added" or "In Place" in violation of the settlement agreements. And, "something else has to occur…in writing, as to how these are implemented." (DE 586 at 47-49.) But it did not. Instead, TRW's counsel told the Court that ESI essentially opts the class members out of the protocols *after including them*. (*Id* at 65.)

As a matter of policy, TRW adjusting its preapproval programs *on an individual basis* does not account for or reasonably protect those who are unaware of the fact that their rights are being infringed. Second, it cannot be that class members must question each denial of a prescription medication because of what

counsel for TRW admits to be an imperfect system.  This is particularly off-putting in view of the age of this litigant class and the quantity of drugs and medical conditions that TRW made subject to preapproval protocols—270 drugs[5] and 35 medical conditions.  (DE 573-4 at 3-9, ESI 62-66.)

As a secondary argument, TRW claims that the preapproval programs applicable to the *Golden*, *Fox*, and *Colby* class members have been applied in a modified way—only limiting prescription drug benefits to advance the safe use of medications—so as to comply with the 2011 and 2016 Injunctions. The crux of this argument appears to be a *post hoc* rationale for TRW's inability to comply with the Court's orders.  It is unpersuasive.  As the *Rolex* court held, intent in contempt cases is irrelevant, even if these processes were implemented for the safe use of medication.  *Rolex Watch U.S.A.*, 74 F.3d at 720.  Because safe use restrictions will materially affect the extent of coverage for class members — as is evidenced by Mr. N.P.'s Gabapentin denial (based on TRW's unilateral opinion that compounded medicines may be unsafe because they are not regulated by the FDA)— TRW's actions have violated the 2011 Injunction.[6]

---

[5] This number was calculated by adding the 249 drugs requiring "Prior Authorization" and the 21 drugs and 35 medical conditions having "duration/quantity management."  (DE 573-4, ESI 62-66.)

[6] Gabapentin is a compound drug because it is converted from a powder to a cream for ease of topical application.  *Compounding and the FDA: Questions and Answers*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/human-drug-

TRW also fails to categorically and in detail provide an explanation for why the non-compliant preapproval protocols from the 2015 and 2016 Service Addenda—in violation of the 2011 Injunction—continue to remain "In Place" even after the 2016 Injunction.  To date, TRW has provided no proof whatsoever that the protocol has changed.  The 2016 Injunction reiterates that TRW is enjoined from implementing ESI's policies that "unilaterally institute preapproval procedures for previously covered prescriptions."  In short, the 2015 and 2016 Service Addenda violate the Court's 2016 Injunction in largely the same way that the 2011 Injunction was violated.

### 3.    Relief cannot be determined at this time

To determine the appropriate remedy in this case, there must be some discovery to understand the extent of TRW's liability, so that it may, perhaps, be quantified.  It is unclear at this point whether the denial of benefits to the two class members identified thus far are merely isolated incidents or two tips of the larger iceberg.  The continued inclusion of prohibited protocols in the 2015 and 2016 Service Addenda, coupled with a lack of demonstrable instruction from TRW to ESI that the class members should be excluded from them – essentially creating an "opt-out" system of implementation, which is fraught with the risk of prohibited

---

compounding/compounding-and-fda-questions-and-answers.  A safe use denial for a topical cream only undermines TRW's credibility, and more convincingly supports denial on the true basis of a cost savings theory.

denials – violates the settlement agreements and this Court's prior orders.  If it

turns out that the two known denials were one-time mistakes, albeit predictable

ones, based upon the existing service agreement, then the sanction for contempt

should so reflect.  However, discovery will be necessary in order to determine the

extent of the denials which flow from this faulty scheme.  If this discovery reveals

more extensive or even widespread denials in violation of the Court's orders, then

a significantly more severe sanction may be appropriate, including a complete

disgorgement of profits in order to deter future disobedience of and coerce

compliance with this Court's orders.[7]  Plaintiffs are flying blind in their endeavor

to assure compliance with the Court's orders, and should be given leave to uncover

any additional improper denials of benefits that may have occurred. To that end, as

informed by oral argument, I recommend that Plaintiffs be granted the following

additional discovery/information:

- TRW should have to explain how it has implemented the injunctions and removed the pre-authorization protocols/programs from its contract with ESI and its protocol for administration (a question which TRW has apparently refused to answer thus far).

- TRW should provide copies of those documents, if any, in which it informed ESI of the injunctive relief granted by this Court or of the Court's orders related to the settlement agreements.  TRW should also provide copies of any written instructions given to ESI referring to the settlement agreements or Court's orders, including but not limited to

---

[7] Plaintiffs argue, convincingly, that by including the preapproval protocols, prior authorization requirements, step therapy and duration quantity management in the plan, TRW realizes a significant profit.  (DE 586 at 7, 25.)

instructions not to implement the enjoined protocols vis à vis the class members.   (DE 586 at 12-13, 66-67, 76);

- TRW should answer interrogatories regarding cost savings achieved by keeping the prohibited protocols "in place" (*Id*. at 24-25);

- TRW should provide a list of each denial made with respect to a class member for any reason other than medical necessity (*Id*. at 28, 59, 70-71); and

- Plaintiffs should be permitted to take the depositions of Charlie Kiwic, the "gentleman who was in charge of this department" and/or who was the "pharmacy benefits manager", and Shelly Iacobelli, the former "Director [of] Pension Benefits." (*Id*. at 67, 68; DE 573-5).

It seems inevitable that the protocols that remain "in place" would ensnare the two class members' claims which are discussed in detail here.  It seems unlikely that they are the only ones.  Discovery will tell.

## III.    CONCLUSION

The Plaintiff has shown by clear and convincing evidence that TRW is in civil contempt of court and sanctions are appropriate in order to deter and prevent future transgressions.  The form or magnitude of the most appropriate sanctions cannot be determined without further discovery.  It is accordingly recommended that the Court hold TRW in civil contempt and that the Court grant leave for Plaintiffs to conduct additional discovery, holding in abeyance its decision on sanctions until discovery is completed.  The Court should also award Plaintiffs their costs and a reasonable attorney fee associated with the instant motion and in

connection with the additional discovery necessitated by TRW's above-described actions.

All these years after the original settlement agreements, and after multiple Court orders clarifying and enforcing the agreement, TRW should have a more reasonable, failsafe approach for implementing the benefits of these elderly class members.  By now, there is no excuse for continuing to include them in a plan containing preapproval protocols, prior authorization requirements, step therapy and duration quantity management components.

## IV.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

24

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:   September 20, 2019          s/*Anthony P. Patti*
                                      Anthony P. Patti
                                      UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on September 22, 2019, electronically and/or by U.S. Mail.

                          s/Michael Williams
                          Case Manager for the
                          Honorable Anthony P. Patti
                          (313) 234-5200